IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TERRY FERGUSON                  *
                                *
v.                              *
                                *    Civil Action No. WMN-12-1035
UNITED OF OMAHA LIFE            *
INSURANCE COMPANY <u>et al.</u>        *
                                *
    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

**<u>MEMORANDUM</u>**

   This action is brought under the provisions of the Employee

Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 <u>et seq.</u>

Plaintiff Terry Ferguson, on behalf of the estate of his late

brother, Plaintiff John Ferguson,[1] seeks to recover accidental

death insurance benefits under a group policy issued by

Defendant United of Omaha Life Insurance Company (United of

Omaha).  Ferguson was pulled, unconscious, from a public

swimming pool on September 15, 2010, and died at a local

hospital on October 1, 2010, having never regained

consciousness.  United of Omaha denied Plaintiff's claim for

accidental death benefits after concluding that Ferguson had

experienced an epileptic seizure while swimming, which

contributed to his death.  In United of Omaha's view, Ferguson's

---

[1] For clarity and ease of reference, Terry Ferguson will be
referred to herein as Plaintiff and John Ferguson will be
referred to simply as Ferguson.

death was not "independent of Sickness and all other causes" and thus, not covered under the policy.

Before the Court are cross motions for summary judgment, ECF No. 22 (Defendants')[2] and ECF No. 23 (Plaintiff's). The motions are ripe for review. Upon review of the briefing, the administrative record, and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that Plaintiff's motion will be granted and Defendants' denied in part and granted in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At the time of his death, Ferguson was 39 years old and a frequent participant in marathons and triathlons. To train for these events, he swam regularly at the North Arundel Aquatic Center in Glen Burnie, Maryland. He had also been diagnosed with epilepsy several years prior and was receiving regular treatment for his epilepsy from his neurologist, Francis J. Mwaisela, M.D.

In February of 2010, Ferguson experienced a seizure while swimming that led to his near-drowning and a three-day hospitalization. On March 9, 2010, Ferguson had a follow up visit with Mwaisela and Mwaisela increased the dosage of his

---

[2] As explained, _infra_, in addition to United of Omaha, Plaintiff also named Ferguson's benefit plan, The ProObject, Inc. Group Life and Accidental Death and Dismemberment Benefit Plan (the ProObject Plan), as a defendant.

seizure medication.  Ferguson inquired during that visit as to whether he could continue to swim and Mwaisela told him he had "no problems in him doing so providing one of his colleagues will keep eye contact with him throughout the entire time he is in the water."  AR 000220.[3]  At a subsequent follow-up visit on July 26, 2010, Ferguson reported that he had no seizure-like episodes since the increased dosage of his medication.  AR 000215.

On the evening of September 15, 2010, at least one life guard was on duty poolside at the North Arundel Aquatic Center and at least one other individual, Marc Womeldorf, was swimming in the pool at the same time as Ferguson.  In a statement given on May 5, 2011, Womeldorf states that he observed Ferguson "porpoising," i.e., "letting himself drift to the bottom into a crouch position, stay there maybe a minimum of several seconds in a stopped position and then push off towards the surface."  AR 000341.  Womeldorf stated that he believed this was a training technique used to increase an athlete's tolerance for lack of oxygen.  At one point, Womeldorf noticed Ferguson in a "'prone on elbows position' with his hands clasped near or under his chin and stable, not moving."  Id.  While Womeldorf could not remember precisely how long Ferguson was in this position

_____

[3] Defendant submitted its Administrative Record (AR 000001 through AR 000778) as an exhibit to its motion.

3

before he grew concerned and swam toward him, he stated it was
between 25 and 70 seconds.  Womeldorf swam to Ferguson, pulled
him to the surface, "gave him at least 2 rapid breaths clearing
his mouth out in between after which he threw up twice, passive,
involuntary.  He was not conscious."  AR 000342.

With the assistance of a life guard, Ferguson was pulled
from the pool and Womeldorf and a life guard started two person
CPR.  An Anne Arundel County Fire Department Medic unit
responded to the scene and continued CPR until he was
transported by ambulance to the Baltimore Washington Medical
Center (BWMC).  An Anne Arundel County police officer who also
responded to the scene stated in his Incident Report that he was
advised that Ferguson was under water for approximately two
minutes before he was pulled out of the water.  The officer also
states in his report that "[e]mployees of the aquatic center
advised that Ferguson swims frequently and tells the staff that
he suffers from epilepsy."  AR 000085.  When the officer arrived
at BWMC, the charge nurse told him that Ferguson had been
admitted in February 2010 after having a seizure at the aquatic
center.  The officer concludes his report by opining that "[i]t
is believed that Ferguson had a seizure while swimming in the
pool."  Id.

Ferguson was intubated in the intensive care unit at BWMC
where he was treated for about two and a half weeks but never

regained consciousness.  While at BWMC, he was examined by
numerous physicians who consistently included in their notes the
conclusion that Ferguson had a seizure that led to his drowning.
See, e.g., AR 000087 (Discharge Summary of Dr. Ratnakar
Mukherjee - "In summary, the patient was in a pool when he had a
seizure episode.  He subsequently went into respiratory distress
. . . ."); AR 000105 (Consultation Note of Dr. Poorima Sharma -
"This is a 38-year-old gentlemen with a history of seizure
disorder on Tegretol[4] who, while swimming, developed a seizure
episode leading to aspiration and drowning."); AR 000125
(Consultation Note of Dr. Sangjin Oh - Ferguson "presented to
the hospital after a drowning episode secondary to seizure and
then going into cardiac arrest.").  As his condition continued
to worsen, Ferguson's family decided that it was better to
"terminally wean[] him off of the ventilator and [he] passed
away with dignity."  AR 000087.

    At the time of his death, Ferguson was covered under a
Group Term Life and AD&D (Accidental Death and Dismemberment)
Policy, Policy No. GLUC-AE2C (the Policy), issued by United of
Omaha to his employer, ProObject, Inc.  In addition to a basic
life insurance benefit, the Policy provided an "AD&D Benefit"[5]

---

[4] Tegretol is a seizure medication.

[5] The AD&D benefit paid in the case of death is an amount equal
to twice the employee's annual salary.  See AR 000017 (defining

that, according to the Summary of Coverage, "is paid if an

employee is injured as a result of an Accident, and that Injury

is independent of Sickness and all other causes." AR 000017.

The Policy Certificate (which constitutes the Summary Plan

Description, <u>see</u> AR 000048), contains the following definitions.

> **Accident** means a sudden, unexpected, unforeseeable and
> unintended event, independent of Sickness and all
> other causes.
>
> Accident does not include Sickness, disease, bodily or
> mental infirmity or medical or surgical treatment
> thereof, bacterial or viral infection, regardless of
> how contracted. Accident does not include bacterial
> infection that is the natural result of an accidental
> external bodily injury or accidental food poisoning.

AR 000038 (emphasis in original).

> **Injury** means an accidental bodily injury which
> requires treatment by a Physician. It must result in
> loss independently of Sickness and other causes.

AR 000051 (emphasis in original).

> **Sickness** means a disease, disorder or condition, which
> requires treatment by a Physician.

<u>Id.</u> (emphasis in original).

The "Exclusion" provision of the Certificate contains the

following exclusion: "We will not pay for any loss which . . .

(g) does not result from an Accident." AR 000040. The "A&D

---

the Principal Sum as the benefit for a loss of life), AR
FERGUSON-000023 (equating the amount of life insurance in force
with the Principal Sum) and AR 000015 (defining the life
insurance benefit as twice the employee's annual salary).

Exclusions" page of the Summary of Coverage repeats that same exclusion. AR 000018 ("We will not pay for any loss which . . . does not result from an Accident.").

The beneficiaries under the Policy are Plaintiff and Ferguson's sister, Holly McGrath, and on or about October 19, 2010, Plaintiff and Ms. McGrath submitted a claim under the Policy. On November 24, 2010, United of Omaha approved the payment of $179,000 in Basic Life under the Policy. In a letter dated January 11, 2011, however, United of Omaha advised Plaintiff and Ms. McGrath that their claim for Accidental Death benefits was denied. AR 000079. After quoting the definition of "Accident" set out above, the letter stated, "According to the information received from the Anne Arundel County Police Department and the Baltimore Washington Medical Center, John's death was not independent of sickness and all other causes. Therefore, we are unable to allow accidental death benefits." Id.

Following that initial denial, counsel for Plaintiff sent several letters to United of Omaha challenging that decision and submitting various materials. In a July 18, 2011, letter, he summarized and submitted various medical articles about risk of death and injury for epileptics and also discussed various court decisions mandating the payment of accidental death benefits under facts similar to those presented here. AR 000411 –

000415.  An August 5, 2011, letter forwarded additional medical articles about seizure disorders and inaccuracies in death certificates and determinations of causes of death, and also contained additional legal argument challenging the denial of accidental death benefits.  AR 000376 – 388.  In a September 19, 2011, letter, Plaintiff's counsel cited additional legal authority for his position.  AR 000210 – 000211.

By letter dated November 11, 2011, United of Omaha informed Plaintiff's counsel that it had completed its review of the appeal and had determined that its previous decision was appropriate.  AR 000200 – AR 000202.  The letter stated that the following materials were reviewed:

Statement of PolicyHolder or Group Administrator

Statements of Beneficiary or Other Claimant

Police Report dated September 15, 2010

Certificate of Death filed October 5, 2010

Medical records from [BWMC] dated September 12, 2010 through October 1, 2010

Medical records from Dr. Mwaisela dated March 9, 2010 through July 26, 2010

Letters from [Plaintiff's counsel] dated July 18, 2011, August 5, 2011 and September 19, 2011 and the information provided with those letters, including the information provided on CD-R

Reviews by our Physician Consultant.[6]

AR 000200. After referencing: (1) Ferguson's medical history of seizures; (2) Mwaisela's instructions regarding his continued swimming; (3) the death certificate listing of the cause of death as "drowning due to (or as a consequence of) seizure disorder;" and, (4) the health care providers at BWMC opining that "the drowning was the result of a seizure," the letter concluded, "[i]n summary, Mr. Ferguson's death was not

---

[6] Plaintiff provides a litany of reasons as to why the reviews of United of Omaha's Physician Consultant, Dr. Thomas Reeder, should be discounted, including: Reeder is United of Omaha's Senior Vice-President and Medical Director and therefore, not in any sense independent; he has earned his livelihood from insurance defense practice for years, providing reviews as an expert for insurance companies in more than 50 decisions; his reviews were criticized and considered inadequate in two of those decisions, Crespo v. Unum Life Ins. Co. of America, 294 F. Supp. 2d 980 (N.D. Ill. 2003) and Epling v. American United Life Ins. Co., Civ. No. 08-02, 2009 WL 129785 (E.D. Ky. Jan. 20, 2009); and, Reeder is an internist not certified in forensic pathology and, thus, not qualified to render an opinion as to cause of death. ECF No. 23 at 28-31. Plaintiff submitted various materials in support of these assertions, but United of Omaha argues that the Court cannot consider these "extra-record materials" because this Court's review is limited to the "evidence that was before the ERISA fiduciary when the claim was denied." ECF No. 24. One would hope that United of Omaha was well aware of, and took into consideration, Reeder's experience, areas of expertise, potential conflicts of interests, and criticisms of his previous reviews when it assigned him the task of reviewing this case. It would be troublesome, indeed, if this information was not "before the fiduciary" and considered by the fiduciary. Regardless, because the Court need not reach the issue on which Reeder opined, it need not determine if these materials can be considered here.

independent of sickness and other causes.  Due to this, accidental death benefits are not payable."  AR 000201.

Having exhausted his administrative appeals, Plaintiff timely filed this action.

## II. STANDARD OF REVIEW UNDER ERISA[7]

When reviewing a denial of benefits under an ERISA-governed plan, a district court must first determine "whether the relevant plan documents confer discretionary authority on the plan administrator."  DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011).  When an ERISA plan vests its administrator with discretionary authority to construe the terms of the plan and determine eligibility for benefits, the plan's eligibility determination is subject to review only for abuse of discretion.  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008); Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111–15 (1989).  The Policy here includes the following provision regarding the authority to interpret the Policy:

> The Policyholder has delegated to Us [United of Omaha] the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.  Benefits under the Policy will be paid only if We decide, after exercising Our discretion, that the Insured Person is entitled to them.  In making any decision, We may rely on the accuracy and

---

[7] While United of Omaha inserted in its motion two pages discussing the legal standard for a typical summary judgment motion, ECF No. 22-2 at 11-13, much of that standard is not particularly relevant to a review of a benefits determination under ERISA.

> completeness of any information furnished by the
> Policyholder, and Insured Person or any other third
> parties.

AR 000007. Thus, this Court applies an abuse of discretion

standard to its review.

Under ERISA, the Fourth Circuit has instructed courts to

consider a number of factors in determining whether an

administrator has abused its discretion in denying a claim,

including the administrator's "motives and any conflict of

interest it may have." Booth v. Wal-Mart Stores, Inc. Assocs.

Health & Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000). In

Glenn, the Supreme Court clarified the role that this factor

should play in a court's analysis. The existence of a conflict

of interest does not alter the standard of review the court

employs; rather, it is "but one factor among many" that a court

should consider in evaluating the administrator's decision. See

554 U.S. at 116. Once a conflict of interest has been

identified, "the circumstances of the particular case" determine

"the significance of the factor" to the court's review of the

decision. Id. at 108.

Here, United of Omaha has acknowledged that it was acting

under a structural conflict of interest in that it was acting as

both the insurer of the benefits and the claims administrator of

said benefits. ECF No. 22-2 at 15. United of Omaha also

argues, however, that its dual role "'should prove less

11

important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy.'"  ECF No. 24 at 6 (quoting Glenn, 554 U.S. at 117).  While United of Omaha suggests that the importance of its inherent conflict "can be said [to have] diminished 'to the vanishing point,'" it is not clear to the Court what "active steps" United of Omaha took to reduce the potential bias.  Id.[8]  Regardless, because the weight given to this particular factor does not alter the Court's final conclusion, it need not determine how adequately United of Omaha has addressed its structural conflict.

As to the interpretation of insurance policies under ERISA, the Fourth Circuit has held that "courts are to be guided by federal common law rules."  Johnson v. Gen. Am. Life Ins. Co., 178 F. Supp. 2d 644, 650 (W.D. Va. 2001) (internal citation omitted).  In Wheeler v. Dynamic Engineering, Inc., 62 F.3d 634, 638 (4th Cir. 1995), the court held that ERISA plans are to be interpreted "under ordinary principles of contract law, enforcing the plan's plain language in its ordinary sense" and a

_____

[8] United of Omaha suggests that its conflict of interest was "neutralized by its thorough investigation of the Plaintiff's claim and subsequent appeal."  ECF No. 24 at 6.  In light of the fact that United of Omaha assigned the review of the claim to its own in-house medical director who is not certified in forensic medicine and whose objectivity is subject to question, see supra, n.6, the Court would not view that as an "active step" to reduce bias.

court properly looks to "principles of state common law to guide [its] analysis." Similarly, "[a]lleged ambiguities should be reconciled, if possible, by giving language its ordinary meaning . . . ." Glocker v. W.R. Grace & Co., 974 F.2d 540, 544 (4th Cir. 1992). The Fourth Circuit, however, has declined "to apply a strict interpretation of the policy language," where a "literal application of such policy language would nullify the benefits an insured could expect from a policy in a large number of instances." Danz v. Life Ins. Co. of N. Amer., 215 F. Supp. 2d 645, 651 (D. Md. 2002) (citing Adkins v. Reliance Standard Life Ins. Co., 917 F.2d 794, 796 (4th Cir. 1990)).

In ERISA cases, the insured bears the initial burden of establishing that the claim falls within the scope of coverage while the insurer has the burden of proving that an exclusion applies. Jenkins v. Montgomery Indus., 77 F.3d 740, 743 (4th Cir. 1996). Specifically in the context of AD&D policies that, as here, require that covered injuries result "directly and independently of all other causes," the Fourth Circuit has refined a "two-step determination: first, whether there is a pre-existing disease, disposition, or susceptibility to injuries; and second, whether this pre-existing condition, pre-disposition, or susceptibility substantially contributed to the disability or loss." Quesinberry v. Life Ins. Co. of N. Amer., 987 F.2d 1017, 1028 (4th Cir. 1993).

Finally, in reviewing a plan's determination of coverage under the deferential abuse of discretion standard, a court is generally limited to the evidence in the administrative record before the administrator when the administrator made the decision under review.  Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788-89 (4th Cir. 1995); Brodish v. Fed. Express Corp., 384 F. Supp. 2d 827, 833 (D. Md. 2005) ("Generally, the Fourth Circuit defines the administrative record as those facts known to the administrator at the time the administrator made the benefits eligibility determination.").

## III. DISCUSSION

### A. Was Ferguson's Seizure a Cause of His Death?

The parties devoted a large portion of their briefing to the issue of whether or not there was substantial evidence that Ferguson experienced a seizure while swimming on the evening of September 15, 2010, and thus, whether it was a seizure that caused him to drown.  Although the health care providers appear to have quickly made the assumption that he had, there is no direct evidence of a seizure.  Significantly, neither of the two individuals present at the pool at the time - Womeldorf nor the life guard on duty who was stationed at the pool – stated that they observed any signs of a seizure.  Plaintiff represents that this is in sharp contrast to the "open and obvious seizure activity which was witnessed in February, 2010 at the same

14

facility." ECF No. 23 at 18; see also id. at 3 (representing that the February, 2010 seizure was "obvious to all who were present").[9] Plaintiff also argues that multiple EEGs performed at BWMC "did not reveal any evidence of post-epileptic seizure activity" which, in Plaintiff's view, **is irrefutable medical evidence that a seizure did not take place.**" Id. at 3 (emphasis in original).[10]

It is fairly apparent from the record that, because the staff at the aquatic center and the staff at BWMC were aware that Ferguson previously had a drowning episode that was caused by a seizure, everyone simply made the assumption that this second drowning episode was also caused by a seizure. After being told by the aquatic center staff that Ferguson had told them that he suffers from epilepsy, and by the charge nurse that he was admitted in February 2010 after having a seizure while swimming, the police officer concluded his report by opining that "[i]t is believed that Ferguson had a seizure while swimming in the pool." AR 000085 (emphasis added). While the

_____

[9] The Court notes that, while Plaintiff makes this representation regarding the February 2010 event, he cites nothing in the record supporting the obvious nature of that seizure event.

[10] Several of the interpretations of the Electroencephalograms, or EEGs, did state that the EEGs were not consistent with the diagnosis of status epilepticus. See, e.g., AR 000149, AR 000151. As Defendant notes, however, these EEGs were taken days after the drowning episode. Nothing in the record supports the conclusion that a seizure on September 15, 2010, would be reflected in EEGs taken days later.

conclusion that Ferguson had a seizure episode that led to drowning and aspiration is repeated time and again in the medical notes, there is nothing in those notes to explain why the health care providers believed that he had experienced a seizure, other than his history of epilepsy and the previous occurrence of a similar event.[11]

Ultimately, however, the Court need not decide if it was reasonable for United of Omaha to conclude that a seizure was a cause of the drowning, because, in this Court's view, the relevant question under the Policy is whether Ferguson's seizure disorder was a cause of his death. Courts interpreting the language of similar accidental death policies have treated these two questions independently, and have denied coverage only when the disease or pre-existing condition was a cause of the death or injury, not when it was simply the cause of the accident that led to a death or injury.

One of the leading cases highlighting the importance of this distinction is Kellogg v. Metropolitan Life Insurance Company, 549 F.3d 818 (10th Cir. 2008). In Kellogg, a witness observed the insured appear to have a seizure immediately before the insured's car drove off of the road and crashed into a tree.

---

[11] The Court notes that this assumption is not necessarily unreasonable. Ferguson was a competitive athlete who swam regularly. Something unusual must have occurred to cause him to drown and, in light of his history, a seizure is a possible explanation.

16

The insured died of a brain hemorrhage, caused by a skull fracture sustained in the crash. The coroner also found that the insured had high post-mortem blood levels of a drug that has a reported risk factor of causing seizures.

At the time of his death, the insured was covered under an AD&D policy that provided benefits if the insured sustained an "accidental injury that is the Direct and Sole Cause of a Covered Loss." Id. at 821. "Direct and Sole Cause means that the Covered Loss occurs within 12 months of the date of the accidental injury and was a direct result of the accidental injury, independent of other causes." Id. The Certificate of Insurance also contained an exclusion, "[w]e will not pay benefits under this section for any loss caused or contributed to by . . . physical or mental illness or infirmity, or the diagnosis or treatment of such illness or infirmity." The Summary Plan Description stated that "losses due to . . . 'physical or mental illness' were excluded" from coverage. Id.

The insurer initially denied the claim for accidental death benefits on the ground that "[u]nder the terms of the plan, AD&D benefits are not payable if the loss is due to a physical illness. The decedent's physical illness, the seizure, was the cause of the crash. Accordingly, we must deny your claim." Id.

17

at 823.[12]  The Tenth Circuit rejected that rationale, concluding

that "the car crash – not the seizure – caused the loss at

issue, i.e., [the insured's] death, and therefore the

exclusionary clause of the policy does not apply."  Id. at 829.

The court then cited and discussed numerous cases "reject[ing]

attempts to preclude recovery on the basis that the accident

would not have happened but for the insured's illness."  Id. at

831.

    One of those cases cited involved an epileptic seizure and

drowning, National Life & Accident Insurance Co. v. Franklin,

506 S.W.2d 765 (Tex. App. 1974).  In Franklin, the insured, who

had a history of epileptic seizures, was found dead in a

---

[12] Before the district court, the insurer argued for the first
time that the plaintiff's claim failed because the insured's
death "did not result from an accident 'independent of other
causes'" and the district court granted summary judgment for the
insurer on that ground.  The Tenth Circuit held that it was
error for the district court to grant judgment on a ground not
raised when initially denying the claim.  This Court recognizes
that the argument reached by the district court is closer to the
argument advanced by Defendants in this action.  The Tenth
Circuit did not reach the merits of that decision and this Court
respectfully disagrees with the reasoning of the district court.
This Court also notes that the district court appears to have
misread the language of the policy.  The policy provided that
covered AD&D benefits must arise from "an accidental injury that
is the Direct and Sole Cause of a Covered Loss," and defines
"Direct and Sole Cause" as "a direct result of the accidental
injury, independent of other causes."  Kellogg v. Metro. Life
Ins. Co., Civ. No. 06-610, 2007 WL 2684536, at *7 (D. Utah Sept.
7, 2007) (emphasis added).  In its holding, the district court
inexplicably dropped the word "injury" and concluded that the
insurer was entitled to judgment because the insurer's "death
was not the direct result of an accident 'independent of other
causes.'"  Id.

18

bathtub.  The insurance policy at issue covered losses resulting

"directly and independently of all other causes, from bodily

injuries effected solely through external, violent and

accidental means," and contained an exclusionary clause

prohibiting payment for losses that "result[] from or [are]

contributed to by any disease or mental infirmity."  Id. at 766.

The court held that, even if it was determined that the

insured's epilepsy caused him to lose consciousness and fall

into the bathtub, it did not cause the death.  Id. at 767.  The

court explained, "[t]he epilepsy was merely a cause of a cause

and was therefore too remote to bar recovery."  Id. (emphasis

added).

Orman v. Prudential Insurance Co., 296 N.W.2d 380 (Minn.

1980), also involved a fall into a bathtub caused by a disease,

in this case, the bursting of a cerebral aneurysm which caused

the insured to lose consciousness.  While the policy at issue in

Orman excluded losses "caused or contributed to by bodily

infirmity or disease," id. at 381, and the aneurysm would be

considered a disease under the policy, the court held that the

exclusion did not apply because the aneurysm did not cause the

death:

> It was a mere fortuity that the decedent stood
> over a bathtub full of water at the time the aneurysm
> burst and rendered her unconscious.  In other words,
> the aneurysm may have contributed to the accident, but
> it did not contribute to the death.  In such

circumstances, the aneurysm is simply too remote to be deemed a direct or contributing cause of death.

Id. at 382 (emphasis added).

The Kellogg court also quoted a decision written by President William Howard Taft when he served as a judge on the Sixth Circuit, Manufacturers' Accident Indemnity Co. v. Dorgan, 58 F. 945 (6th Cir. 1893). In Dorgan, the insured went fishing and was found dead, submerged in a brook. There was some evidence that he had previously suffered from dizziness caused by a defect in his heart. In denying coverage, the insurer argued, inter alia, that the insured "died in consequence of disease, and that his death was not caused by any accident or accidental injury which was the proximate and sole cause of his death." Then-Judge Taft wrote:

> [I]f the deceased suffered death by drowning, no matter what was the cause of his falling into the water, whether disease or a slipping, the drowning, in such case, would be the proximate and sole cause of the disability or death, unless it appeared that death would have been the result, even had there been no water at hand to fall into. The disease would be but the condition; the drowning would be the moving, sole, and proximate cause.

Id. at 954 (emphasis added).

Cases following Kellogg have come to similar conclusions. In Pavicich v. Aetna Life Insurance Company, Civ. No. 09-818, 2010 WL 3854733 (D. Colo. Sept. 27, 2010), a case brought under ERISA, the insured fell while having a seizure believed to be

caused by his anti-depression medications.  He suffered a
cervical spine injury as a result of the fall and underwent a C-
spine fusion.  After the surgery, he developed high fevers and
other complications and he died in the hospital about a week
after the fall.  The insurer denied accidental death benefits,
relying on language in the policy that provided: "This coverage
is only for losses caused by accidents.  No benefits are payable
for a loss caused or contributed to by: a bodily or mental
infirmity, a disease ... [or] medical treatment."  Id. at *5.
The insurer reasoned: "the death was caused by complications
resulting from a cervical spinal cord injury which resulted from
a fall, that the fall was a direct result of a generalized
tonic-clonic seizure likely related to medications to treat
depression and bipolar disorder and, consequently, the loss was
caused or contributed to by a bodily or mental infirmity and
medical treatment."  Id. at *4.

Reviewing the insurer's denial of coverage determination
under an abuse of discretion standard, the court found that
denial to be arbitrary and capricious.  Id. at *10.  The court
concluded that:

> [the insured's] hospitalization and death were
> directly caused by an accident — his fall — which
> caused a severe cervical spine injury.  Although the
> parties dispute whether the [insured's] fall was
> caused by a seizure and/or any medication that he may
> have been taking, the Court finds that such dispute is
> not material.  Seizure activity or the taking of the

prescribed medication were not but-for causes of [the insured's] hospitalization and subsequent death; rather, his accidental fall was. . . .

Further, the Plan does not exclude coverage for deaths resulting from accidents caused by "a bodily or mental infirmity" or "medical treatment," such as medication. Rather, the Plan excludes coverage for deaths resulting from such infirmities or medical treatment.

Id. (first emphasis added, other emphasis in original).[13]

District courts in the Fourth Circuit addressing similar claims under ERISA have also looked to Kellogg. In Genal v. Prudential Insurance Company of America, Civ. No. 11-182, 2012 WL 2871777 (D.S.C. July 12, 2012), the insured had suffered from multiple sclerosis (MS) for approximately 25 years and was using a motorized scooter to ambulate. After he was found unresponsive on the ground in his back yard with his scooter nearby, it was determined that he died of environmental heat exposure. He apparently fell from the scooter and, because of his MS, was unable to get up or crawl into his house. The insured had an AD&D policy that provided an accidental death benefit if "[t]he person sustains an accidental bodily Injury while a Covered Person" and "[t]he Loss results directly from that Injury and from no other cause." Id. at *1. The policy

_____

[13] The court opined that, "[the d]efendant could have written the policy in such a way to exclude accidents caused by bodily or mental infirmities or medical treatments, but it did not." Id. While Defendant here may have attempted to write such a policy, for the reasons explained, infra, this Court concludes it also did not.

also contained an exclusion which provided that "[a] Loss is not covered if it results from . . . Sickness whether the Loss results directly or indirectly from the Sickness." <u>Id.</u> The insurer denied the beneficiary's accidental death claim, concluding: "it was the Decedent's MS, not an accidental bodily injury, that prevented him from getting up after he fell ... and, as a result, he was exposed to the heat for approximately two days, which caused his death. Therefore, his death did result directly and/or indirectly from his multiple sclerosis, as sickness." <u>Id.</u> at *3.

In reversing the denial of benefits, the district court noted that "the evidence indicates that the cause of the Decedent's death was initially triggered by the fall from the scooter and not his illness. While the fall by itself may not have caused Decedent's death, but for the fall, Decedent would not have died." <u>Id.</u> at *4. The court also observed,

> but for the heat exposure, Decedent would also not have died. If he had fallen inside his house, while his MS still may have prevented him from getting up, he would not have been subjected to the environmental heat exposure. The court concludes that Decedent's MS did not substantially contribute to his death.

<u>Id.</u> The court also concluded that the exclusion for losses resulting "from any Sickness whether the Loss results directly or indirectly from the Sickness" did not apply. In reaching that conclusion, the court quoted <u>Kellogg</u> for the proposition

23

that "'[a] reasonable policyholder would understand this language to refer to <u>causes contributing to the death, not to the accident</u>.'" <u>Id.</u> at *5 (quoting <u>Kellogg</u>, 549 F.3d at 832) (emphasis added); <u>see also</u> <u>Chapman v. Life Ins. Co. of N. Am.</u>, Civ. No. 08-699, 2013 WL 1314541, at *2, *6 (M.D.N.C. Mar. 28, 2013) (quoting that same language from <u>Kellogg</u> in a decision interpreting an AD&D policy that defined "Covered Accident" as a "sudden, unforeseeable external event that results, directly and independently of all other causes" and that excluded losses which "directly or indirectly, in whole or in part, is caused by or results from . . . Sickness, disease, bodily or mental infirmity").

In light of this substantial line of cases, the question then becomes, in the case <u>sub judice</u>, whether the Policy excludes losses caused by a disease or losses caused by accidents that were caused by a disease. Before returning to the language of the Policy to resolve that question, the Court notes that United of Omaha makes no argument that Ferguson's seizure, if he had one, was a direct cause of his death. That is, there is no suggestion, and there is certainly not substantial evidence, that, had the alleged seizure not occurred while he was in the water, the seizure would have resulted in his death. Just as the insured in <u>Genal</u> had the misfortune of falling outside, which led to heat exposure, Ferguson, assuming

he had a seizure, had the misfortune of having that seizure while swimming, which led to his drowning.

Turning to the language in the Policy, United of Omaha relies on the definition of "Accident" which excludes "sudden, unexpected, unforeseeable and unintended event[s]" that are "independent of Sickness and all other causes." AR 000038 (emphasis added). As written, this definition would appear to eliminate the possibility of any event ever being considered an accident. If the insured slips and falls on an icy sidewalk, it would not be an accident under this language because the presence of ice on the sidewalk would be a cause of the event. Describing the efforts of insurance companies to manufacture reasons to deny accidental death coverage, the Fourth Circuit has opined that, "[a]t one extreme, insurance companies can be characterized as proffering an interpretation of policy provisions in which 'accidental death' coverage applies only on facts 'which [are] the equivalent of a truck dropping from the skies, striking squarely and killing instantly a perfectly fit human specimen clutching a just-issued physician's clean bill of health.'" Hall v. Metro. Life Ins. Co., 259 F. App'x 589, 594 (4th Cir. 2007) (quoting Collins v. Metro. Life Ins. Co., 729 F.2d 1402, 1404 (11th Cir. 1984)). Under United of Omaha's definition of "Accident," not even this extreme scenario would result in coverage because whatever caused the truck to fall

from the sky would be deemed a cause of the event, excluding coverage.

The only reasonable interpretation of the Policy is the interpretation United of Omaha itself gave in its Summary of Coverage.  According to that document, an AD&D Benefit "is paid if an employee is injured as a result of an Accident, <u>and that Injury is independent of Sickness and all other causes</u>."  AR 000017 (emphasis added).  <u>See</u> <u>Kellogg</u>, 549 F.3d at 833 (noting that the plain meaning of the policy at issue was supported by the employer's own interpretation of the coverage in the Summary Plan Description).  Under this language in the Summary of Coverage, the Injury, not the Accident, must be independent of Sickness and all other causes.  This is also consistent with the definition of "Injury," which states that the Injury "must result in loss [in this case, death] independently of Sickness and other causes."  AR 000051.  In its letter denying benefits, the reason given by United of Omaha for that denial was that Ferguson's "<u>death</u> was not independent of sickness and all other causes," AR 000077 (emphasis added).  It did not claim to base its decision on a conclusion that <u>the accident</u> was not independent of sickness.  Significantly, after reciting the language of the Policy in their briefing, Defendants summarize: "Accordingly, the Plaintiff has the burden of proving that his brother's pre-existing seizure disorder did not substantially

contribute to his death," not to his drowning.  ECF No. 22-2 at

22.[14]

Most of the cases relied upon by Defendants are

distinguishable on their facts.  The court in Genal specifically

distinguished the case before it from Danz v. Life Insurance

Company of North America, 215 F. Supp. 2d 645 (D. Md. 2002), the

only case from this Circuit cited by Defendants that was decided

on even remotely similar facts as those presented here.  In

Danz, the insured, a truck driver, suffered a heart attack while

driving his rig, the rig drifted off the roadway, through a

guardrail, down an embankment, and overturned in a ditch.  The

insured was found dead in the cab of his truck.  The

beneficiaries argued that the injuries suffered in the accident

were the cause of his death.  The insurer, however, denied the

claim on the ground that his preexisting cardiac condition

substantially contributed to his death and the policy at issue

only covered "loss[es] from bodily injuries caused by an

_____

[14] While United of Omaha places that burden on Plaintiff,
Plaintiff contends that United of Omaha has the burden of
establishing the applicability of an exception to coverage.  The
Court agrees that the burden properly falls on United of Omaha.
The Policy has essentially defined the scope of coverage by
including an exclusion within the definition of that coverage,
i.e., while losses caused by accidents are covered, if Sickness
or any other cause contributes to that loss, coverage is
excluded.  Here, however, where there is absolutely no evidence
that Ferguson's seizure, if he had one, contributed to his death
and not just to the accident, it is ultimately immaterial which
party carries the burden.

accident . . . which, directly and from no other causes, result in a covered loss." Id. at 647-48. In support of this denial, the insurer's expert witness offered clear, cogent, and unimpeachable testimony that the insured "suffered sudden cardiac death while driving and that he was clinically dead at the time of impact." Id. at 653, 655. Thus, unlike Ferguson, whose seizure would not have killed him were he not swimming at the time, the insured in Danz would have died from his cardiac event even had he not been driving.

Several of the other cases on which Defendants rely are similarly distinguishable. In Honican v. Stonebridge Life Insurance Company, 455 F. Supp. 2d 662 (E.D. Ky. 2006), a 75 year old insured fell, broke a hip, had successful surgery on the hip, but died of a massive stroke one day later. The court observed that, in this type of accidental death policy, there is no coverage "'where death is due both to the accident and to the disease.'" 455 F. Supp.2d at 667 (quoting Commonwealth Life Ins. Co. v. Byck, 268 S.W.2d 922, 925 (Ky. 1953)) (emphasis added in Honican). The court upheld the denial of benefits based on compelling evidence that the insured's prior health problems, which included, "among other things, minor heart failure, possible pneumonia, a urinary tract infection, coronary artery disease, diabetes type II, hypertension, edema, dementia, and left-sided weakness from a stroke," had "played a part, if

not a primary role, in her death." Id. at 663, 668.  Defendants

do not even argue that Ferguson's alleged seizure was a similar

direct cause of death.

In Puszkarewicz v. Prudential Insurance Company of America,

which was quoted at length by Defendants, the insured had an

epileptic seizure while in the bathtub and was found dead with

his head submerged, face down, in the water.  55 A.2d 431, 431

(Pa. Super. Ct. 1947).  It was conceded, however, that death was

not from drowning.  Id.  The coroner testified that the seizure

caused massive hemorrhages in the lungs which precluded their

functioning.  The family physician testified on direct that he

believed the hemorrhaging was caused by the insured's attempt to

breath under water while unconscious from the epileptic attack.

On cross examination, however, the family physician admitted

that the hemorrhaging could have been "induced by the violence

of the seizure itself, (inferentially), without suffocation from

the immersion of decedent's head in the water of the tub."  Id.

at 502.  The court found the evidence was "in equal balance as

to the occurrence or non-occurrence of an accident" and that the

plaintiff had failed to meet her burden of proof.  Here, there

is no similar evidence that Ferguson's death was directly caused

by anything other than drowning.

The Court is aware that other cases cited by Defendants

would appear to support the conclusion that, to deny an

accidental loss claim, United of Omaha need only show that a
pre-existing condition caused the accident which caused the
loss.  See, e.g., McGuire v. Reliance Standard Life Insurance
Company, 205 F.3d 1341 (6th Cir. 2000) (table, unpublished
disposition); Southern Farm Bureau Life Ins. Co. v. Moore, 993
F.2d 98 (5th Cir. 1993).  To the extent that those cases stand
for that proposition, this Court finds them inconsistent with
the teaching of the Fourth Circuit that insurance policies
should not be so strictly interpreted that they nullify the
benefits that the insured reasonably expects from such a policy.
See Danz, 215 F. Supp. 2d at 651 (citing Adkins, 917 F.2d at
796).  Here, Ferguson died of an accidental drowning.  Whether
the cause of the drowning was a seizure, a slip and fall into a
pool, being swept off a boat, or any other cause, is simply not
material.  See Pavicich, 2010 WL 3854733, at *10.

### B. Was Ferguson's Seizure an "Unexpected" or "Unforseeable" Event?

In its motion for summary judgment, Defendants also argue
that Plaintiff's claim was properly denied because Ferguson's
death by drowning was "foreseeable."  ECF No. 22-2 at 39-41.
Although Defendants argue otherwise, this rationale for denying
the claim was clearly not given in United of Omaha's initial
letter denying coverage.  AR 000077.  The letter did recite the
entire definition of "Accident," which is quoted above, and that

definition does include the word "unforeseeable." Id.
Immediately following that definition, however, United of Omaha
stated, "[a]ccording to the information received from the Anne
Arundel County Police Department and the Baltimore Washington
Medical Center, John's death was not independent of sickness and
all other causes. Therefore, we are unable to allow accidental
death benefits." Id. That is the sole reason given and United
of Omaha included nothing in that letter to suggest that the
claim was also being denied because the accident was somehow
foreseeable.

It is well established that, under ERISA, "judicial review
[is] 'limited to whether the rationale set forth in the initial
denial notice is reasonable.'" Hall v. Metro. Life Ins. Co.,
259 F. App'x 589, 593 (4th Cir. 2007) (quoting Thompson v. Life
Ins. Co. of N. Am., 30 F. App'x 160, 164 (4th Cir. 2002) and
collecting cases) (emphasis added in Hall). This rule is based
upon the premise that to allow the insurer to present new
arguments for the first time on judicial review would deny the
insured the "full and fair" review procedural safeguards that
ERISA and its implementing regulations require. See Ellis v.
Metro. Life Ins. Co., 126 F.3d 228, 236-37 (4th Cir. 1997).
Therefore, this court "may not" and will not "consider a new
reason for claim denial offered for the first time on judicial
review." Thompson, 30 F. App'x at 164.

## C. Is Plaintiff Entitled to Statutory Administrative Penalties?

In the Complaint, Plaintiff alleges that Plaintiff's counsel sent a request for "all summary plan documents, governing claims manual provisions or handling instructions under which this claim was reviewed," Compl. ¶ 18, and Defendants failed to produce those requested documents. Id. ¶ 19. Plaintiff then prayed for penalties in the amount of $110 per day pursuant to 29 C.F.R. §§ 2560.502–1(g) et seq. Id. ¶ 22. Defendants suggest that this failure to produce documents claim is the only reason that Ferguson's benefit plan, the ProObject Plan, was named as a defendant. In Defendants' motion, they observe that the administrative record reveals that Plaintiff's counsel promptly received all of the documents that he requested. ECF No. 22-2 at 42-47.

In his cross-motion and opposition to Defendants' motion, Plaintiff makes no direct response on this issue. He does complain that United of Omaha violated ERISA violations by failing to provide Reeder's medical review before denying the claim. ECF No. 23 at 32. In making that argument, Plaintiff relies, in part, on Abram v. Cargill, 395 F.3d 882 (8th Cir. 2005).

To the extent that this is the basis for Plaintiff's administrative penalties claim, it fails.  The holding in <u>Abram,</u> on which Plaintiff relies, was subsequently abrogated by changes in the regulations implementing ERISA.  <u>See</u> <u>Midgett v. Washington Group Int'l Long Term Disability Plan</u>, 561 F.3d 887, 895 (8th Cir. 2009).  In recognizing that abrogation, the Eighth Circuit in <u>Midgett</u> looked to the reasoning of the Tenth Circuit in <u>Metzger v. UNUM Life Ins. Co. of Am.</u>, 476 F.3d 1161 (10th Cir. 2007), where that court observed that "'requiring a plan administrator to grant a claimant the opportunity to review and rebut medical opinions generated on administrative appeal 'would set up an unnecessary cycle of submission, review, re-submission, and re-review.' . . .  Such a cycle 'would undoubtedly prolong the appeal process . . . .'"  <u>Id.</u> (quoting <u>Metzger</u>, 476 F.3d at 1166).

This Court finds that United of Omaha was not obligated to produce Reeder's medical review prior to issuing its benefit determination.  Accordingly, the Court concludes that Plaintiff is not entitled to administrative penalties.  In addition, the ProObject Plan will be dismissed as a defendant.

### D. Is Plaintiff Entitled to Attorney's Fees?

Under ERISA, a district court "in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  The Supreme Court has

clarified that a fee claimant need not even be a "prevailing party" to be eligible for an attorney's fees award under § 1132(g)(1). Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 252 (2010). Instead, a claimant may be entitled to fees "if the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'" Id. at 255 (quoting Ruckelshaus v. Sierra Club, 463 U.S. 680, 688 (1983)). Here, Plaintiff has prevailed on his primary claim and, thus, has achieved significant success on the merits.

In the Fourth Circuit, however, the court, in deciding whether to exercise its discretion to grant attorney's fees, must also analyze the factors set forth in Quesinberry v. Life Insurance Company of North America, 987 F.2d 1017, 1028-29 (4th Cir. 1993), which are "general guidelines" and not a "rigid test." See Williams v. Metro. Life Ins. Co., 609 F.3d 622, 635 (4th Cir. 2010) (noting the continued viability of the Quesinberry approach after Hardt). These factors are: "(1) [the] degree of opposing parties' culpability or bad faith; (2)[the] ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting

attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions." Id. (quoting Quesinberry, 987 F.2d at 1029).

The Court finds Plaintiff's entitlement to fees a close question. As to the first factor, United of Omaha's culpability or bad faith, the Court disagrees with Plaintiff's assertion that United of Omaha improperly withheld Reeder's medical review during the administrative process. On the other hand, United of Omaha's decision, in the first instance, to assign the review to an individual who is not a forensic specialist and is one with doubtful subjectivity was questionable, at best. Furthermore, the Court finds somewhat disingenuous United of Omaha's attempt to represent at this stage of the proceedings that it had denied coverage because Ferguson's drowning was "foreseeable." This factor weighs slightly in favor of awarding fees.

As to the second factor, there is no dispute that United of Omaha has the ability to satisfy the award.

As to the third factor, both sides acknowledge that this factor hinges on the first factor, in that, unless there is a finding of some culpability or bad faith, there is no conduct to be deterred. Hopefully, the award of fees in this case would encourage United of Omaha to select a more appropriate medical

reviewer in a case of this sort and to refrain from injecting post-hoc justifications for its determination when those determinations are challenged in court.

The Court finds that the fourth factor tips in neither direction. Plaintiff brought this action primarily to obtain benefits for himself and his sister and not all plan participants. While there may be some incidental benefit to other participants, this was not the goal of this litigation.

The final factor, the relative merits, ultimately weighs in favor of Plaintiff, but not unconditionally. While the Court found merit in Plaintiff's arguments regarding the interpretation of the Policy, Plaintiff made some spurious arguments on some other issues. Most notably, Plaintiff, in his motion, appeared to fault United of Omaha for not conducting an autopsy as part of their benefit determination. ECF No. 23 at 2, 18. Defendants appropriately responded to that argument by noting that Ferguson died on October 1, 2010, and the claim for benefits was not submitted until October 19, 2010. Defendants opined that to suggest that United of Omaha was obligated to exhume the body to conduct an autopsy is "not only unreasonable, but highly outrageous and extremely insulting." ECF No. 24 at 9. Rather than concede the point, Plaintiff retorted that any argument relying on the fact that an autopsy would require exhuming the body "should fall on deaf ears" and that Defendants

were "utilizing drama for drama's sake in order to cover for their purposeful avoidance of acquiring evidence that undermines their position." ECF No. 25 at 6. While the Court finds this and other arguments advanced by Plaintiff to be of questionable merit, the Court believes that this should go not to whether Plaintiff is entitled to attorney's fees, but perhaps to the amount of fees that should be awarded.

On balance, the Court finds that the Quesinberry factors weigh in favor of the award of fees. Accordingly, the Court will instruct Plaintiff to submit a brief accompanied by affidavits and exhibits in support of a motion for reasonable attorney's fees within 14 days.[15] That motion can then be briefed consistent with Local Rule 105.2.

## IV. CONCLUSION

For the above stated reasons, the claims against Defendant ProObject will be dismissed, as will Plaintiff's claim for statutory administrative penalties. Defendants' motion will be otherwise denied and Plaintiff's motion for summary judgment will be granted. The Court finds that Plaintiff is entitled to accidental death benefits under the Policy. A separate order will issue.

---

[15] Plaintiff failed to submit a proposed order with his cross-motion for summary judgment. Plaintiff is instructed to also submit a proposed order with his motion for fees which addresses the amount of benefits due under the policy and any other issues related to interest or other recovery.

_____/s/_____
                           William M. Nickerson
                           Senior United States District Judge

March 11, 2014